**Bettie PAGE, Plaintiff,**

v.

**SOMETHING WEIRD VIDEO, et al., Defendants.**

**No. CV 94–2327 RAP (BQRx).**

United States District Court, C.D. California.

Dec. 3, 1996.

Stanley Fleishman, Robert Moest, David Grosz, Fleishman, Fisher & Moest, Los Angeles, CA, James Bouras, Law Office of James Bouras, New York City, for Defendants.

Martin Singer, Max Sprecher, Lavely & Singer, Los Angeles, CA, for Plaintiff.

AMENDED ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING DEFENDANTS' MOTION FOR ATTORNEYS' FEES

PAEZ, District Judge.

## I.

### INTRODUCTION

This diversity action arises out of the alleged misappropriation of plaintiff Bettie Page's ("plaintiff" or "Page") "likeness" in the recent advertising of home video cassettes for two films in which she starred in the 1950s.[1] The films starring Page were made in New York when Page was employed by Irving Klaw. The rights to these films were sold or assigned to defendants.

Until recently, the films were thought to be lost. In the 1980s, with the revival of Page's films and popularity, defendants entered into an agreement to re-cut the two films that are the subject of this action. Defendants have been issued a copyright for the new versions of the films. Page alleges that an unauthorized "likeness" in the form of art work was commissioned by defendants in connection with the release of the films on video. The gravamen of plaintiff's complaint is that the defendants misappropriated plaintiff's likeness for commercial gain when they used a drawing of plaintiff (rather than a photograph or still image) in advertisements and on the video box cover. Specifically, plaintiff's complaint alleges violations of California Civil Code § 3344 and the common law right to publicity.

On August 14, 1995, the Court issued an Order ruling that California law applies to this action. *Page v. Something Weird Video,* 908 F.Supp. 714 (C.D.Cal.1995). On August 28, 1996, the Court filed an Order Granting Defendants' Motion for Summary Judgment and Denying Plaintiff's Motion for Summary Judgment ("Order"). Judgment for defendants was entered on August 30, 1996.

Pending before the Court are the parties' cross-motions for summary judgment, which the Court revisits after granting plaintiff's Motion for Reconsideration and vacating its original Order, and Defendants' Motion for Attorneys' Fees. After full consideration of the moving, opposition, and reply papers on the original motions; plaintiff's motion for reconsideration; and Defendant's Motion for Attorneys' Fees, the Court **GRANTS** Defendants' Motion for Summary Judgment; **DENIES** Plaintiff's Motion for Summary Judgment, and **GRANTS** Defendants' Motion for Attorneys' Fees.

## II.

### UNDISPUTED FACTS

For purposes of their cross-motions for summary judgment, the parties stipulated to the following undisputed facts:

---

1. Her "likeness" is in the form of "original" art work. Page does not challenge defendants' use of her photographs or the distribution of the video cassettes.

Plaintiff Bettie Page ("Page" or "plaintiff") worked extensively as a professional model, performer, and actress in New York City during the 1950's. Page posed as a model for photos that appeared on the cover or inside dozens of magazines, including *Playboy* and *Art Photography*. Page also appeared in plays, television shows, and motion pictures.

One of Page's employers in the 1950's was Irving Klaw ("Klaw"). Notably, Page appeared as a featured performer in two theatrical motion pictures produced by Klaw, *Varietease* and *Teaserama*. When distributed to theaters by Klaw, the advertising for both *Varietease* and *Teaserama* included Page's name and visual image.[2]

The only agreement between Page and Klaw produced in this litigation provides, in relevant part:

> I, the undersigned, being of lawful age for and in consideration of $_____ received, do release and give all commercial and publication rights to photographs and motion picture films taken of myself with or without the use of may name, solely and exclusively to IRVING KLAW or assignee.

(Declaration of Max Spencer, Exh. A.). The agreement is dated September 22, 1956 and executed by Page. Neither party produced any agreement between Page and Klaw in which Page reserved any copyright or other proprietary interest in either of the two films.

On March 12, 1963, Klaw assigned the copyrights for both *Varietease* and *Teaserama* to Sonney Amusement Enterprises, Inc. ("Sonney"), and also sold Sonney the negatives, prints, still photographs and advertising material for the two films.

The copyrights for the two films were not renewed in the 28th year after their first publication, as required by 17 U.S.C. § 304(a).

At the end of 1957, Page retired from modeling, performing and acting. During the past decade, however, there has been a great deal of public interest in Page. There have been a large number of newspaper and magazine articles, as well as a few books, addressing Page in particular, or with Page as part of a general revival of interest in the 1950's. Page has been characterized as a "cult queen" and a "nostalgic icon." [3]

Defendant Something Weird Video ("SWV") is a manufacturer and distributor of prerecorded home videocassettes of older motion pictures.[4] SWV sells the videos directly to consumers through mail order catalogues, to wholesalers, and to certain retailers.

In December of 1992, defendant Friedman entered into an oral agreement with Sonney to distribute *Varietease* and *Teaserama* on home videocassette. Friedman also entered into an agreement with SWV to sublicense the rights he had acquired from Sonney. In return, Sonney gave Friedman and SWV access to the negatives of the two films. The agreement between Friedman and Sonney was reduced to writing on March 1, 1993, and the agreement between Friedman and SWV was reduced to writing on March 8, 1993.

In early January 1993, under the supervision of SWV, the negatives of *Varietease* and *Teaserama* were edited to include "revisions, editing, outtakes, inserts and other previously unpublished cinematographic material." The edited versions of the two films, which were labeled as "new editions," have been registered with the U.S. Copyright Office.

In late January and early February 1993, SWV placed an advertisement in various publications announcing the release of the home videos of *Varietease* and *Teaserama*. Plaintiff contends this advertisement con-

---

2. Plaintiff contends all visual images were photographs, while defendants contend some of them were drawings. There is no evidence in the record directly supporting either contention.

3. Page asserts that her likeness has become "recognized throughout the United States as the quintessential 'pin-up' model, and is now, akin to

the likeness of James Dean and Marilyn Monroe, other nostalgic icons." Complaint at ¶ 11.

4. According to its own literature, SWV is "the curator and conservator of the nation's consummate collection of eclectic exploitation and sexploitation movie videotapes."

tains a drawing ("new artwork") [5], which misappropriates plaintiff's likeness. On February 6, 1993, *SWV* began mailing to its previous customers an 18–page "Update" announcing its new releases, including *Varietease* and *Teaserama*. The "Update" also included the advertisements at issue in the current action.

The advertisement was also incorporated into SWV's catalog, which was in use from March to July of 1993. Although defendant charges its customers $3.00 for the catalogue, the money charged for the catalogue is not intended to make a profit, nor does it in fact make a profit for SWV.

The first videocassette of the new editions of the two films were shipped to SWV customers on March 22, 1993. The video cassettes were encased in box covers, which according to plaintiff also includes on it new artwork, which improperly misappropriates plaintiff's likeness. SWV admits that it commissioned the new artwork appearing in the advertisements at issue herein, as well as the videocassette box cover.

### III.

### *DISCUSSION*

**A. *Cross-Motions for Summary Judgment***

At the threshold, it is undisputed that plaintiff was a performer in *Varietease* and *Teaserama;* that plaintiff does not hold and has never held any copyright or other proprietary interest in either of the two films; that defendants have a right to distribute the two films in the form of prerecorded video cassettes; and that SWV's challenged advertisements announced the release of *Varietease* and *Teaserama*. Thus, the issue presented by these cross-motions for summary judgment is whether defendants' use of an artistic likeness of plaintiff ("new artwork") in advertising the two motion picture videos in which plaintiff stars violates either plain-

tiff's common law right to publicity or California Civil Code § 3344.[6]

**1. *California Rights to Publicity***

"California has long recognized a common law right of privacy which includes protection against appropriation for the defendant's advantage, of the plaintiff's name or likeness." *Abdul–Jabbar v. General Motors Corporation*, 85 F.3d 407, 413 (9th Cir.1996) (internal brackets and ellipses omitted) (citing *Eastwood v. Superior Court for Los Angeles County*, 149 Cal.App.3d 409, 417, 198 Cal. Rptr. 342 (1983)).

In California, to prevail on a cause of action for common law misappropriation of plaintiff's name or likeness, plaintiff must establish: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Montana v. San Jose Mercury News, Inc.*, 34 Cal.App.4th 790, 793, 40 Cal.Rptr.2d 639 (1995). Unlike Civil Code § 3344, the scope of the common law tort applies not only to a person's "name or likeness," but also to that which is distinctive or personal to the individual, such as a professional persona. *See Waits v. Frito–Lay, Inc.*, 978 F.2d 1093 (9th Cir.1992), *cert. denied*, 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993) (singer's voice); *Midler v. Ford Motor Co.*, 849 F.2d 460 (9th Cir.1988) (singer's voice); *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993) (marketable celebrity identity).

California also provides a statutory cause of action for misappropriation of a person's likeness. California Civil Code § 3344. "The statutory cause of action complements rather than codifies common law misappropriation." *Montana*, 34 Cal.App.4th at 793,

---

**5.** By "new artwork," plaintiff means only drawings of Page which were not used prior to 1993. All parties agree that the "new artwork" at issue embodies Page's likeness. SWV admits that it commissioned preparation of the new artwork, and that it placed the new artwork in the advertisements.

**6.** For purposes of this action, Page does not dispute that defendants have the right to distribute the video cassettes or to use still images or photographs lifted from the films to advertise the videos.

40 Cal.Rptr.2d 639. Civil Code § 3344 provides, in relevant part:

> Any person who knowingly uses another's name, ... or likeness, in any manner, ... for purposes of advertising or selling ... goods or services, without such person's prior consent ... shall be liable for any damages sustained ...

■ In addition to the common law elements, the statute requires two further allegations: "(1) knowing use; and (2) a direct connection ... between the use and the commercial purpose." *Abdul–Jabbar,* 85 F.3d at 414. The Ninth Circuit has construed section 3344's "protection of 'name, voice, signature, photograph, or likeness' more narrowly than the common law's protection of identity." *Id.* at 1399.

■ In resolving the current motions the Court need not address the merits of plaintiff's prima facie case because the Court concludes that plaintiff's action is barred by the First Amendment.[7]

### 2. *First Amendment*

■ Defendants argue that because the advertisements in question are incidental to a constitutionally protected activity, namely publication of the videos *Varietease* and *Teaserama,* the advertisements are likewise protected. In response, plaintiff argues that advertisement is a commercial activity, and is therefore not protected by the First Amendment. Plaintiff argues that because SWV charges its customers for the catalogue in which the advertisements appear, the advertisements constitute "commercial speech." This argument, however, is not supported by the admissible, undisputed evidence. Rather, undisputed evidence establishes that defendant did not intend or in fact make a profit from its catalogue sales. The catalogue was purely a form of advertising defendants' products. However, plaintiff also argues that SWV used Page's likeness to promote its other products.

Promotional speech may be noncommercial if it advertises an activity itself protected by the First Amendment. *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 67 n. 14, 103 S.Ct. 2875, 2880 n. 14, 77 L.Ed.2d 469 (1983). "Although 'commercial speech' has not traditionally enjoyed constitutional protection, commercial solicitation or promotion of constitutionally protected ... works is protected as an incident to the First Amendment value of the underlying speech or activity." *People v. Fogelson,* 21 Cal.3d 158, 165 n. 7, 145 Cal.Rptr. 542, 577 P.2d 677 (1978); *see also, Bolger,* 463 U.S. at 68, n. 14, 103 S.Ct. at 2881, n. 14 ("Of course, a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment."); *Cher v. Forum International, Inc.,* 692 F.2d 634, 638 (9th Cir.1982), *cert. denied* 462 U.S. 1120, 103

7. Defendants raise several unmeritorious affirmative defenses which the Court summarily dismisses: plaintiff is not limited to contract remedies and may assert tort claims for misappropriation of her likeness for commercial use; plaintiff states a cognizable injury; plaintiff's claims are not preempted by the Copyright Act or the work for hire doctrine; defendants have not presented evidence that plaintiff consented to defendant's use of her likeness; plaintiff's claims are not barred by the equitable doctrines of waiver, laches or estoppel; and the subject advertisement is not "newsworthy" as defined in California Civil Code § 3344.

The newsworthiness doctrine is inapplicable here because the information was not part of an editorial, a news broadcast or public affairs. As the Ninth Circuit recently held, use of newsworthy information in the context of an advertisement, as opposed to a news or sports account, is not protected by section 3344(d). *Abdul–Jabbar,* 85 F.3d at 416; *compare Dora v. Frontline Video Inc.,* 15 Cal.App.4th 536, 541, 18 Cal.Rptr.2d 790

(1993) (finding documentary on surfing protected by newsworthy exception to § 3344); *but see Montana,* 34 Cal.App.4th 790, 40 Cal.Rptr.2d 639 (applying newsworthiness doctrine to protect newspaper's right to promote itself by reproducing news stories). In other words, applying the Ninth Circuit's most recent delineation of the scope of the § 3344 newsworthiness doctrine to the facts of this case, the reemergence of the films is newsworthy, and the films themselves are newsworthy, but pure advertisement of the films, and of other videocassettes of the same genre, is not.

Because the Court concludes that the First Amendment affirmative defense is dispositive of the entire action, the Court need not reach the remaining constitutional issues presented in defendants' and plaintiff's motions, namely whether the application of California law violates due process and full faith and credit, and whether plaintiff's claims violate the Commerce Clause or the Supremacy Clause.

S.Ct. 3089, 77 L.Ed.2d 1350 (1983) ("the right of publicity has not been held to outweigh the value of free expression").

This principle has been applied to advertisements for a film:

> Having established that any interest in financial gain in producing the film did not affect the constitutional stature of [defendant's] undertaking, it is of no moment that the advertisement may have increased the profitability of the film. It would be illogical to allow [defendants] to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprises. Since the use of Valentino's name and likeness in the film was not actionable infringement of Valentino's right of publicity, the use of his identity in advertisements for the film is similarly not actionable.

*Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 873, 160 Cal.Rptr. 352, 360, 603 P.2d 454 (Bird, J., concurring).

Here, plaintiff challenges defendants' advertising for the two films starring plaintiff. Based on the undisputed facts of this case, defendants' use of plaintiff's likeness in advertising the films *Varietease* and *Teaserama* was "incidental" to the publication of the videos themselves. Defendants' advertising is protected because the videos themselves are protected by the First Amendment, and the advertising is incidental to the protected publication of the videos.

Plaintiff attempts to distinguish her case from the line of authority protecting activities that are incidental to protected speech. First, plaintiff argues that the defendants impermissibly used a drawing of plaintiff (the "new artwork") rather than a still image from the films. This argument is not persuasive. Plaintiff cites no authority, nor did the Court's own research disclose any authority, recognizing the difference between the use of a still image from the film and "new artwork" which depicts the likeness of plaintiff as seen in the films.[8] Plaintiff does not argue that the drawings depict anything other than what the viewers can expect to see in the films. Rather, the new artwork is virtually indistinguishable from a still image which could have been used.

■ Second, plaintiff argues that SWV appropriated her likeness in violation of California law by promoting other videocassette products in the advertisements of the videos in which she starred. The advertisements at issue include information on how to obtain a catalog of SWV's merchandise and state

> DAVID FRIEDMAN'S ROADSHOW RARITIES promises not only to be our most popular series yet, but with over 100–plus volumes in the works it will also be the most extensive, the most exhaustive, the most extraordinary collection of titles ever offered on video! And what better way to kick off this gala event than with the 2 most glorious words in glamour ...
> **BETTY PAGE!**

This language suggests that plaintiff is correct in arguing that the advertisement could be interpreted as an advertisement not only for *Varietease* and *Teaserama,* but for defendant's entire line of products.

Nonetheless, plaintiff's position flies in the face of established Ninth Circuit analysis of the scope of First Amendment protection of advertisement of protected publications.

> Constitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of protected publication and promotes only the protected publication. Advertising to promote a news medium, accordingly, is not actionable under an appropriation of publicity theory so long

**8.** "It is common practice in the motion picture industry to advertise a picture by means of drawings depicting the advertiser's conception of its dramatic or emotional highlights and quite often, in composite form, by the superimposition of some other scene or something added from the fertile imagination of the artist. Presumably this practice is resorted to when the stills from the picture are not deemed sufficiently exciting to draw the patrons to the box-office...." *Dahl v.* *Columbia Pictures Corporation,* 12 Misc.2d 574, 575, 166 N.Y.S.2d 708, 710 (1957), aff'd 7 A.D.2d 969, 183 N.Y.S.2d 992 (1959) (libel action arising from artists' drawing for advertisement of motion picture); *see also Montana,* 34 Cal.App.4th at 792, 40 Cal.Rptr.2d 639 (explicitly approving newspaper's use of an "artistic rendition" of Montana, in addition to use of actual photographs of him, to promote its newspapers).

as the advertising does not falsely claim that the public figure endorses that news medium.

*Montana,* 34 Cal.App.4th at 797, 40 Cal. Rptr.2d 639 (protecting newspaper promotion that used photos and an artistic rendition of Montana based on First Amendment right to advertise quality and content of periodical by republishing work as advertisement); *Cher,* 692 F.2d at 639 (holding First Amendment would entitle Forum, upon purchasing an interview with Cher from another magazine, to use Cher's picture for the purpose of indicating the content of its publication).[9]

Motion pictures and films generally enjoy the same First Amendment protection as traditional news media. *See, Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502, 72 S.Ct. 777, 780–81, 96 L.Ed. 1098 (1952); *Weaver v. Jordan,* 64 Cal.2d 235, 49 Cal. Rptr. 537, 411 P.2d 289 (1966), *cert. denied,* 385 U.S. 844, 87 S.Ct. 49, 17 L.Ed.2d 75 (1966). As the New York Times article of November 17, 1995, suggests, mail-order videos provide a primary means of obtaining information about the 1950s subculture for which plaintiff has become "a nostalgic icon." In an earlier article, the New York Times recognized that the "orgy of historical revisionism" that has made Betty Page a nostalgic icon "masks a serious purpose: the recovery of forms of expression that were denied by the dominant culture." July 24, 1994, Section 1, page 41, col. 2–4, page 44, col. 1–5.

Thus, the promotion of vintage videos is itself a medium for transmission of news that is of interest not only to marginal groups, but to such mainstream papers as the New York Times. As a result, the First Amendment protection of newspapers and magazines outlined in *Montana* and *Cher* extends to protect SWV's use of Page's image to advertise their entire line of video products so long as they did not falsely claim that Page endorsed SWV. Plaintiff does not argue that SWV falsely claimed that Page endorsed SWV. Consequently, SWV is entitled to promote its

medium, videocassettes, by using Page's likeness in its advertising to demonstrate the quality and content of its videos.

Accordingly, defendants' use of plaintiff's likeness at issue in this action is protected by the First Amendment and defendants are entitled to judgment as a matter of law on plaintiff's causes of action under California's right of publicity laws.

**B. Attorneys' Fees**

**1. Legal Standard**

■ In a diversity case, the availability of attorneys' fees is governed by state law. Schwarzer, Tashima, and Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL § 1:50.5 (The Rutter Group 1996) (hereinafter Schwarzer); *Mangold v. California Pub. Util. Comm'n,* 67 F.3d 1470, 1478 (9th Cir.1995). This action was brought under California Civil Code § 3344, which includes a prevailing party fee provision. Under that section, "[t]he prevailing party ... shall also be entitled to attorney's fees and costs." Cal. Civ.Code § 3344(a).

■ The factors considered in calculating a fee award are also governed by state law. Schwarzer, § 1:50.6 (citing *Mangold,* 67 F.3d at 1478). In general, the standards for calculating attorneys' fees are uniform for all California statutory fee provisions. *Cf. Downey Cares v. Downey Comm. Dev. Com'n,* 196 Cal.App.3d 983, 997, 242 Cal.Rptr. 272 (1987). Under California law, courts calculate an award of attorneys' fees by determining a lodestar figure based on the time spent and reasonable hourly compensation for each attorney involved in the case. *Maria P. v. Riles,* 43 Cal.3d 1281, 1295–96, 240 Cal.Rptr. 872, 743 P.2d 932 (1987) (citing *Serrano v. Priest,* 20 Cal.3d 25, 48–49, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977) (*Serrano III* )). The court may, in its discretion, adjust the lodestar amount according to a number of relevant factors including:

(1) the novelty and difficulty of the questions involved and the skill displayed in

---

**9.** Moreover, the undisputed facts state that "SWV placed an advertisement in various publications announcing the release of prerecorded home videocassettes of *Varietease* and *Teasera-*

*ma.*" Thus, the parties themselves have characterized the advertisement as an announcement of the release of the two videos in which Page starred.

presenting them; (2) the extent to which the nature of the litigation precluded employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall on taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing the law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not the individual benefit of the attorneys involved but the organizations by which they are employed....

*Id. Serrano v. Unruh,* 32 Cal.3d 621, 625 n. 6, 186 Cal.Rptr. 754, 652 P.2d 985 (1982) (*Serrano IV*).

### 2. *Fee Award*

■ Plaintiff does not challenge defendants' hourly rates, or the number of hours expended on the case. Instead, plaintiff argues that (1) despite the statutory fee provision, fees should be denied because the case is one of first impression; (2) the Court has not addressed the merits, and therefore defendants are not prevailing parties within the meaning of § 3344 (i.e. success on the First Amendment affirmative defense does not make defendants the prevailing party under the statute); (3) each phase of the trial should be assessed separately and plaintiff prevailed on the choice of law phase; and (4) plaintiff should not be required to pay for defendants' attorneys' fees incurred in preparing defenses on which the Court did not rely in ruling for defendants.

Plaintiff provides no support for any of her arguments. Moreover, her arguments are not supportable. As Witkin puts it: "Obviously the defendant prevails when the plaintiff recovers nothing." 7 B.E. Witkin, *California Procedure, Judgment* § 88 at 524 (3d ed.1985). Thus, plaintiff's first and second arguments fail. On August 30, 1996, the Court entered a judgment ordering "that plaintiff take nothing, that this action be dismissed on the merits and that defendants recover their costs." Although the Court has modified that order to elucidate the Court's

reasoning, the Court's judgment remains unmodified. Thus, the only issue properly before the Court on defendants' motion for attorneys' fees is the amount defendants shall recover.

■ Time reasonably spent by the successful party in advancing unsuccessful theories should not be excluded from the fee award under California law. *Sundance v. Municipal Court,* 192 Cal.App.3d 268, 274–75, 237 Cal.Rptr. 269 (1987) (leaving determination of reasonableness to the trial court). Here, plaintiff contends that defendants unreasonably spent time arguing that New York law should govern and asserting numerous affirmative defenses. Plaintiff has not demonstrated that any of defendants affirmative defenses were unreasonably asserted. Consequently, defendants shall recover for all of their work on the case, not just for the time spent preparing their First Amendment defense during the second phase of the case.

Plaintiff does not challenge defendants' rates or make specific challenges to the number of hours defendants' attorneys claim to have worked on the case. Defendants request an award of attorneys' fees equal to the lodestar amount of $82,491.25 for 47.5 hours expended by Fleishman at $350/hour (his standard rate is $400/hour); 68.39 hours expended by Robert Moest at $250/hour (his standard rate is $285/hour); 185.29 hours expended by David Grosz at $250/hour; and 28.17 hours expended by law clerk Pauline Martin Rosen at $125/hour. With the exception of Rosen, each defense attorney has practiced for at least 18 years and has provided the Court with a declaration explicating his experience and prior fee awards in excess of or equal to the rates requested here. The rates requested by plaintiff's counsel are reasonable. Defendants have not included in their request fees for time their New York counsel spent on the case, despite Mr. Bouras' time arguing both the choice-of-law and summary judgment motions.

■ Given the novelty and difficulty of the questions involved, the skill displayed in presenting the issues, the customary fees, the results obtained, and the experience, rep-

utation, and the ability of the defense attorneys, defendants shall receive the requested fee award of $82,491.25.

### 3. *Award of Costs*

■ Civil Code § 3344 expressly provides that the prevailing party in an action under that section is entitled to an award of costs. Where a statute authorizes an award of fees and costs, but is silent as to which costs are to be awarded, California courts look to Code of Civil Procedure § 1033.5, which sets forth those costs that may and may not be recovered in a civil action.[10] *Davis v. KGO–T.V., Inc.,* 50 Cal.App.4th 772, 777–78, 58 Cal. Rptr.2d 13 (1996). Notable examples of non-recoverable costs are: fees of experts not ordered by the court; investigation expenses, including computer legal research; postage, telephone, photocopying and fax charges; transcripts of court proceedings not ordered by the court; attorney lunches; trial exhibits not used at trial; local travel expenses; and delivery charges. *See* C.C.P. § 1033.5 as interpreted in *Ladas v. California State Automobile Association,* 19 Cal.App.4th 761, 23 Cal.Rptr.2d 810 (1993). Any costs not detailed in § 1033.5 may be allowed or denied at the Court's discretion. C.C.P. § 1033.5.

■ Defendants request $2,751.60 for travel expenses incurred for New York attorney Mr. Bouras' to attend the May 13, 1996, and October 31, 1994, hearings. Section 1033.5 does not deal with transportation costs to attend hearings. The Court, in its discretion, GRANTS defendants that portion of Mr. Bouras' costs that was "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial." *See* C.C.P. § 1033.5(c)(2). The cost of Mr. Boras' airline tickets is excessive. Flying first-class is not "reasonably necessary" to further litigation. The parties cross-motions for summary judgment were scheduled well in advance, and round-trip airfare from New York City to Los Angeles typically need not exceed $600. Consequently, the Court grants defendants request for Mr. Boras' reasonable transportation costs in the amount of $1,200.

Defendants seek costs totalling $7,365.10. However, defendants' break-down of claimed costs reveals that nearly all of the costs claimed are impermissible under *Ladas.* Defendants may recover $240 for court fees. Excepting these court fees and $1,200 for Mr. Bouras' reasonable travel expenses, the Court DENIES defendants' request for costs.

## IV.

### *CONCLUSION*

After full consideration of the moving, opposition, and reply papers, the admissible evidence submitted by the parties, and the oral arguments of counsel, the Court **GRANTS** Defendants' Motion for Summary Judgment; **DENIES** Plaintiff's Motion for Summary Judgment; and **GRANTS** Defendant's Motion for Attorneys' Fees. Judgment in favor of defendants shall be entered forthwith.

IT IS SO ORDERED.

---

**10.** Section 1033.5 describes those costs allowable under Code of Civil Procedure § 1032, which dictates that "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs ..." However, § 1033.5(c)(5) clarifies that when any California statute refers to an award of attorney's fees and costs, the attorney's fees are allowable as costs under that section.

In addition to citing inapplicable federal law, defendants cite *Downey Cares,* 196 Cal.App.3d at 999 n. 13, 242 Cal.Rptr. 272, for the proposition that they are entitled to recover "out of pocket" costs of litigation that are ordinarily billed to a client. The *Downey Cares* court found that because the statutory fee provision at issue there provided for "costs of litigation, including reasonable attorney's fees," the costs were included in the award and were not costs pursuant to C.C.P. §§ 1032 and 1033.5. *Id.* By contrast, the statutory fee provision in Civil Code § 3344 simply provides for an award of "attorney's fees and costs," which clearly falls within the ambit of C.C.P. § 1033.5.